UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| CITY OF MADISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-CV-101 |
| | ) | |
| UBER TECHNOLOGIES, INC. | ) | JUDGE CRABB |
| | ) | |
| Defendant. | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| | ) | |
| | ) | |

---

**DEFENDANT'S MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION TO REMAND**

---

## INTRODUCTION

Defendant Uber Technologies, Inc. ("Uber") timely removed from Madison Municipal

Court the action filed by Plaintiff City of Madison (the "City") asserting claims against Uber for

alleged municipal ordinance violations.  The City filed a Motion to Remand (Doc. Nos. 7-8),

asking the Court to return this case to Municipal Court.  This Court should deny that request.

Uber removed the matter on diversity grounds.  Diversity provides federal courts

jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of

$75,000," and which are between "citizens of different states."  28 U.S.C. § 1332.  The City does

not dispute that this action is between citizens of different states, but rather contends that the

action fails to meet the value threshold and is not a "civil action."   The City is wrong on both

fronts.  In assessing value, the relevant inquiry in this case is the direct "pecuniary result" of the

1

City's requested judgment. Here, that value far exceeds $75,000. To be sure, as the City notes, the Complaint demands $42,000 for alleged past violations, but the reality is that the compliance costs that would arise if the City succeeds on its Complaint are many multiples of that, as are the fines to which Uber would be exposed for the past and ongoing ridesharing activities in the City using the Uber platform. Indeed, nowhere does the City state in its Motion to Remand that it will not continue to assess these fines against Uber again and again—in separate tranches of violations each totaling $42,000. And on the "civil action" front, the law is well-settled that allegations of municipal ordinance violations count as "civil actions" for diversity purposes if a State treats them that way. Here, Wisconsin law expressly elects to treat municipal ordinance violations as civil matters. Federal courts routinely entertain diversity actions in such situations, and the cases the City cites to the contrary are either easily distinguishable or no longer current.

Finally, the City appears to take issue with Uber's reference in its removal papers to the traditional justification for federal diversity jurisdiction—the possibility that local courts may be prejudiced against foreigners. In that regard, the City assures this Court that the Madison Municipal Court will fairly adjudge Uber's rights in this case. But, such assurances are wholly irrelevant to the remand analysis. As this case falls within the diversity jurisdiction statute, Uber is entitled to remove.

Because the City's bases for challenging this Court's jurisdiction are misplaced, Uber respectfully requests this Court deny the City's Motion to Remand and retain jurisdiction over this matter.

## BACKGROUND

On January 21, 2015, the City purported to serve Uber with a 42-count Complaint at an office in Madison, Wisconsin,[1] claiming Uber violated various municipal ordinances.  In the Complaint, the City attempts to inappropriately stretch existing *public* transportation ordinances to cover Uber's innovative new ride-sharing platform, which is not open to the public, but rather only to members of Uber's online community.  (Doc. No. 1-1, Complaint).  The three provisions the City asserts that Uber violates are Madison General Ordinances ("MGO") §§ 11.06(2), 11.06(4)(a), and 11.06(4)(b) (collectively the "Public Transportation Ordinances").  The first of these, § 11.06(2), requires public transportation providers who "engage in the business of transporting passengers for hire or drive a vehicle transporting passengers for hire within the City limits of Madison" to obtain a license.  *Id.* § 11.06(2)(a).  It further provides that "[n]o person shall operate any *public* passenger vehicle until s/he shall have obtained a *public* passenger vehicle driver's permit from the Chief of Police."  *Id.* § 11.06(2)(e) (emphases added).  The remaining two provisions are both in § 11.06(4), which is entitled "Licensing of *Public* Passenger Services." (Emphasis added).  Section 11.06(4)(a) sets forth the fees for a license to engage in the business of transporting passengers.  The remaining cited provision, § 11.06(4)(b), establishes the application process for such a license.

---

[1] The City left the Complaint at the Madison, Wisconsin, desk of Rasier, LLC, Uber's wholly owned subsidiary and licensee, which shares an office with unrelated third parties.  Rasier sublicenses the Uber software platform to independent, third-party transportation providers.

The Complaint appears to assert that Uber violates the Public Transportation Ordinances by making its mobile application (the "Uber App") available.[2]  In particular, the City alleges that the Uber App allows riders who have opened an account with Uber to contact those drivers who have also joined the Uber platform to request a ride.  (Compl. ¶ 4).  According to the City, drivers who are available to accept requests appear as an automobile icon on the Uber App screen.  (*Id.* ¶ 5).  If a driver chooses to accept a transportation request, the automobile icon (indicating a driver's availability) disappears from the mobile application.  (*Id.*).

Against this basic alleged arrangement, the City pleads thirty-nine "counts" based solely on instances in which two individuals accessed the Uber App and observed an automobile icon within the City of Madison.  (*Id.* ¶¶ 9-10).  Specifically, the City alleges five instances in which its employee, Keith Pollock, observed an automobile icon (with each such observation allegedly giving rise to three separate ordinance violations x $1,000 each) and eight instances in which Justin LaPlante—not coincidentally, a local taxicab driver—observed the icon (again, with each such observation allegedly giving rise to three violations x $1,000 each).  (*Id.*).  The City then alleges three instances in which Madison police officers cited individual drivers for violating City ordinances, allegedly by utilizing the Uber App to arrange rides.  (*Id.* ¶¶ 11-13).  Amazingly, the Complaint—which is based on ordinances directed at "transporting passengers"—fails to allege even a single instance in any of the 42 counts in which any passenger was actually ***transported*** anywhere in Madison.

_____

[2] While Uber does not concede the accuracy of any fact alleged in the Complaint, the non-jurisdictional facts as pled, of course, must be accepted as true at this juncture.

As noted above, the City alleges that each observation of an automobile icon, and each driver citation, violates three separate but related provisions of the MGO: §§ 11.06(2), 11.06(4)(a), and 11.06(4)(b).  (Compl. ¶¶ 9-13).  The City further alleges that each violation is subject to a "forfeiture" of "$100 to $1,000 per count, per day; plus applicable costs . . . and any such further relief as the plaintiff may request."  (*Id.*, page 3).

## LAW AND ARGUMENT

I.      **This Case Falls Within The Court's Diversity Jurisdiction And Thus Uber Properly Removed It To Federal Court.**

The removal statute allows a party to remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  The diversity statute provides this Court original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000" that are "between … citizens of different States."  28 U.S.C. § 1332(a).  This action falls within the diversity jurisdiction, and is thus removable.  More specifically, the City does not dispute that it is a citizen of Wisconsin for diversity purposes, nor does it dispute that Uber is a citizen of a different state.  Moreover, as more fully set forth below, despite the City's claims to the contrary, the "matter in controversy" exceeds $75,000, and this is a civil action—indeed, Wisconsin law expressly states that it is.  Accordingly, the action is removable.

A.      **This Action Meets The Amount In Controversy Requirement.**

1.      **The Amount In Controversy Is Determined By This Litigation's "Pecuniary Result" To Uber, Which Far Exceeds $75,000.**

Under Seventh Circuit case law, in assessing the amount in controversy, the relevant inquiry here is the amount at stake in this litigation *for Uber*.  As set forth in the attached declaration of Uber employee Adam Dries (attached hereto as **Exhibit A**), the direct pecuniary

5

result of a judgment determining that Uber's business model violates the cited Madison City ordinances would be far in excess of $75,000.  The City cannot defeat diversity jurisdiction by arbitrarily limiting the number of alleged ordinance violations it asserts to keep the monetary fine under $75,000.  The City's argument on the amount-in-controversy requirement thus simply misses the point.

The amount-in-controversy requirement is subject to a burden-shifting approach.  Once a plaintiff challenges the removal, the defendant bears the burden of establishing that the $75,000 amount-in-controversy threshold is satisfied by a preponderance of the evidence.  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006).  But, "[o]nce the removing party has established by a preponderance of the evidence that the jurisdictional minimum is satisfied, remand is only appropriate if the plaintiff can establish to a ***legal certainty*** that the claim is for less than the requisite amount."  *Bell v. Hershey Co.*, 557 F.3d 953, 956 (8th Cir. 2009) (emphasis added).  *See also Hunt v. DaVita, Inc.*, 680 F.3d 775, 777 (7th Cir. 2012) (affirming district court's refusal to remand where plaintiff "had not shown it was 'legally certain' that the amount in controversy would not exceed $75,000").

The amount-in-controversy requirement is designed "to ensure that a dispute is sufficiently important to warrant federal-court attention."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 562 (2005).  *See also*, *e.g.*, *Hoffman v. Vulcan Materials Co.*, 19 F. Supp. 2d 475, 479-80 (M.D.N.C. 1998) (noting that the amount threshold is designed "to keep trivial cases out of the federal courts") (citing 14A Charles Alan Wright, et al., Federal Practice and Procedure § 3703, at 66-67 (2d ed. 1985)).  In an action seeking declaratory or injunctive relief, the amount in controversy is the "value of the object of the litigation."  *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977).  The Seventh Circuit employs the

"either viewpoint" rule when measuring amount in controversy in such actions. *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 329-30 (7th Cir. 1993). Under this test, the amount in controversy is measured by "the pecuniary result that would flow to the plaintiff (or defendant)" from the court's grant of the requested relief. *America's MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 786 (7th Cir. 2004). In other words, consistent with the requirement's purpose of limiting jurisdiction to "sufficiently important" or "non-trivial" matters, the amount-in-controversy requirement is satisfied "when *either* party stands to gain or lose the statutorily determined amount or its equivalent." *Ericsson GE Mobile Commc'ns, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 120 F.3d 216, 220 n.15 (11th Cir. 1997) (quoting 15 James Moore, Moore's Federal Practice § 102.109[4], at 199 (1997)) (emphasis in original).

The Seventh Circuit, applying the either viewpoint rule, has identified three situations in which the cost of equitable relief to a defendant might satisfy the jurisdictional minimum: (1) where the requested relief would require some alteration in the defendant's business practices that would cost more than the jurisdictional minimum amount; (2) where the requested relief would force the defendant to forgo a benefit that is worth more than the jurisdictional minimum amount; or (3) where the requested relief would entail clerical or ministerial costs of compliance greater than the jurisdictional minimum amount. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 609-10 (7th Cir. 1997).

Applying those rules here, this case easily meets the $75,000 amount-in-controversy requirement. While the City asserts that it is not seeking injunctive or declaratory relief, the City must realize that its success in this matter would effectively constitute a declaration that Uber's business model falls within Madison's Public Transportation Ordinances. And, as a practical matter, any such judgment would serve as an injunction prohibiting Uber from continuing to

operate within Madison City limits.  That is hardly a "trivial" matter of the sort Congress

intended to keep out of federal court.  *See Hoffman*, 19 F. Supp. 2d at 479-80.  Lost profits to

Uber as a result of prohibiting indefinitely rideshare activities in Madison using Uber's

ridesharing platform would exceed $100,000.  (Dries Decl. ¶ 3).  Moreover, if Uber were

required to obtain licenses and permits or change its business so that it operated under the

longstanding and inapplicable Public Transportation Ordinances, the cost of doing so would

exceed $100,000.  (Dries Decl. ¶ 4).

That the City's Complaint purports to seek $42,000 in civil fines is of no import; that is

not the correct measure for amount-in-controversy purposes.  Rather, given the nature of the

allegations here, and the City's ongoing role in enforcing the Public Transportation Ordinances,

as well as the ongoing use of Uber's ridesharing platform in the City, the only correct measure

can be the harm that Uber would suffer if it were subject to the City's Public Transportation

Ordinances and thus forced to adhere to those regulations—which is tantamount to an injunction

against its operations in Madison.  The either viewpoint approach recognizes the reality that

often what is at stake "is not the amount sought by the plaintiff," but the amount at issue ***in the***

***litigation***.  *BEM I, LLC v. Anthropologie, Inc.*, 301 F.3d 548, 553 (7th Cir. 2002).  The Seventh

Circuit has succinctly articulated the rationale behind this approach:  "It seems to us beyond

absurd to allow a defendant to remove if the plaintiff is seeking damages of $75,000.01, but not

if the plaintiff is seeking an injunction directing the defendant to tear down, as a nuisance, a $10

million building that the defendant owns."  *Id.*  The City is in effect seeking to have Uber "tear

down" its valuable property—its ability to conduct business operations in the City of Madison.

Nor does the City improve its argument by claiming that "the Municipal Court does not

have the authority to grant an injunction," in an effort to distinguish the Seventh Circuit amount-

in-controversy case law for declaratory or injunctive relief cases.  (Doc. No. 8 at 2) (citing Wis. Stat. § 755.045(1)(b)).  What the City fails to note in advancing this argument is that municipal courts are expressly authorized to order "[a]n operating privilege suspension or revocation if authorized by law" or "[o]ther dispositions authorized by law."  Wis. Stat. §§ 800.09(1b) & (c). Thus, the Municipal Court arguably has the authority to suspend any license Uber may be required to procure under City ordinances.  And, in any event, for amount-in-controversy purposes, case law in this Circuit is clear that the test is valuation of the end result of the litigation, not the language of the remedy pled.  *See America's MoneyLine*, 360 F.3d at 786. Under the test, the amount-in-controversy requirement is met here.

### 2.    The "Pecuniary Result" Test Precludes The City From Structuring Its Complaint To Avoid Federal Jurisdiction Or Requiring Uber To Wait For Fines To Accumulate To More Than $75,000.

Another settled principle of removal jurisprudence confirms this same result.  More specifically, courts have held that while a plaintiff is the "master of the case," a plaintiff cannot avoid diversity jurisdiction by pleading less than the jurisdictional amount when the true damages would exceed the jurisdictional amount.  "[P]laintiffs in state court should not be permitted to ostensibly limit their damages to avoid federal court only to receive an award in excess of the federal amount in controversy requirement."  *Morgan v. Gay*, 471 F.3d 469, 477 (3d Cir. 2006).  Indeed, courts have recognized "the potential for abusive manipulation by plaintiffs, who may plead for damages below the jurisdictional amount in state court with the knowledge that the claim is actually worth more, but also with the knowledge that they may be able to evade federal jurisdiction by virtue of the pleading."  *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1410 (5th Cir. 1995).  "Such manipulation is surely characterized as bad faith."  *Id.* at 1412.

The City is seeking to structure its pleadings to avoid federal jurisdiction here.  There is no dispute that ridesharing activities using the Uber platform continue to be available in Madison.  According to the City, each instance of ridesharing violates three ordinances—exposing Uber to $3,000 in fines.  Yet, under the City's approach to the amount-in-controversy requirement, the City could continually defeat removal jurisdiction by structuring each of its complaints in Municipal Court to demand $74,999 or less in fines.  Through an approach not unlike that employed by those who structure bank transactions to evade reporting requirements, *see* 31 U.S.C. § 5324 (making it a federal crime to structure bank deposits to avoid reporting requirements), the City could repeatedly allow fines to accrue to just below the jurisdictional threshold and then file a complaint, forever evading federal jurisdiction with full knowledge that the rights at issue in this case are worth far more than $75,000.

To avoid just this result, federal courts have held that as-of-yet uncited conduct is properly taken into consideration when calculating the amount in controversy.  In *Town of Ogden Dunes v. Siwinski*, No. 2:08-cv-78, 2008 WL 1804104 (N.D. Ind. Apr. 17, 2008), the town attempted to enforce one of its residential zoning ordinances prohibiting home owners from leasing their properties to others for periods of less than thirty consecutive days.  The town's August 30, 2007 complaint alleged that beginning on "June 18, 2007 and days thereafter, including, but not limited to, the time of filing this Complaint, the defendants have been in violation" of the zoning ordinances.  *Id.* at *1.  The complaint also included an allegation that the ordinance "authorizes a fine of not more than $2,500 per violation per each day of a violation." *Id.*  The defendants did not remove the action to federal court until well into discovery, when defendants learned the town was seeking more than $10,000 in fines.  *Id.* at *3.  The court, while acknowledging the amount in controversy had been met, remanded the case to state court

10

because the removal was untimely. *Id.* at *4. "[T]he Siwinskis were faced with a penalty for repeated violations of the same statute . . . . [and] had the information at their disposal to know how many violations were encompassed by the complaint, or at least whether there were enough violations to reach the jurisdictional minimum amount." *Id.*

Thus the City is simply wrong to claim that its ability to seek additional penalties under the ordinances is "purely speculative and collateral to this cause of action." (Doc. No. 8 at 2). Rather, the straightforward implication of *Town of Ogden Dunes* is that when calculating the amount in controversy, defendants have a duty to account for uncited or yet-to-be cited conduct when calculating fines for ordinance violations. Here, Uber will be faced with continued fines for violations of the same ordinances, and it need not wait until the City files additional complaints alleging more claims against Uber for past or future conduct. Indeed, under *Town of Ogden Dunes*, Uber arguably ***must*** remove now or forever waive its right to remove later, when the City asserts a right to fines amounting to more than $75,000."

## II.     The Alleged Ordinance Violations Are Civil, Not Criminal, Proceedings.

The only other issue that the City has raised in support of its motion to remand is the nature of this action. Removal and diversity jurisdiction apply only to civil actions, and the City contends that this action is instead criminal. Settled case law holds, however, that when a municipality, like the City, elects to make traffic offenses civil rather than criminal, federal courts will respect the municipality's determination, absent strong evidence that the City has mislabeled them. Here, the State and the City have expressly elected to make ordinance violations a civil matter, and that determination controls.

In *Van Harken v. City of Chicago*, 103 F.3d 1346, 1349 (7th Cir. 1997), the court noted that many states have "decriminalized parking violations and substituted a civil penalty system."

Because of the civil nature of the proceedings, the Seventh Circuit held that the due process

requirements concomitant with criminal prosecutions were not required for parking violations.

*Id.* at 1351.  Courts likewise have applied the same reasoning to find that the double-jeopardy

clause does not attach to ordinance violations.  *See Idris v. City of Chicago*, No. 06 C 6085, 2008

WL 182248, at \*6 (N.D. Ill. Jan. 16, 2008) ("The fact that fines under Chapter 9-102 are

adjudicated in an administrative framework rather than a criminal one is prima facie evidence

that the $90 fine is civil rather than criminal.").

More specifically, to determine whether a particular sanction is criminal or civil, courts

follow a two-part inquiry.  *See Hudson v. United States*, 522 U.S. 93, 99 (1997).  First, the court

determines if the state or local legislature "indicated either expressly or impliedly a preference

for one label or the other."  *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)).

Second, if the legislature "has indicated an intention to establish a civil penalty," the court

determines "whether the statutory scheme [is] so punitive either in purpose or effect as to negate

that intention."  *Ward*, 448 U.S. at 248-49.  In other words, if the City labels it "civil," that label

controls absent evidence that the scheme is *so* punitive that it *must* be treated as criminal.

In *Robledo v. City of Chicago*, 444 F. Supp. 2d 895, 903-04 (N.D. Ill. 2006), for example,

the court applied this two-part test to conclude that a city's traffic and impound ordinances and

penalties were *civil*, not criminal, and therefore plaintiffs were not entitled to certain Fifth and

Sixth Amendment protections (the rights to indictment, trial by jury, and to be proven guilty

beyond a reasonable doubt).  As to the first prong, the court noted that the vehicle disposition

process as "found in the Chicago Municipal Code [is] a means of enforcing the city's current

civil penalty system."  *Id.* at 903.  In particular, the court cited language from the city ordinance

providing that "[t]he violation of any provision of the traffic code prohibiting or restricting

12

standing or parking, or establishing a compliance violation, ***shall be a civil offense punishable***

***by fine***, and no criminal penalty, or civil sanction other than that prescribed in the traffic code

shall be imposed." *Id.* (quoting Chicago Muni. Code § 9-100-20(a)) (emphasis added).

Finding an intent to establish a civil penalty, the court then moved on to the second prong

and considered various factors to determine whether the ordinance was "so punitive in purpose

or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Id.*

(internal citations and quotation marks omitted). These factors included:

> (1) whether the sanction involves an affirmative disability or
> restraint; (2) whether it has historically been regarded as a
> punishment; (3) whether it comes into play only on a finding of
> scienter; (4) whether its operation will promote the traditional aims
> of punishment—retribution and deterrence; (5) whether the
> behavior to which it applies is already a crime; (6) whether an
> alternative purpose to which it may rationally be connected is
> assignable for it; and (7) whether it appears excessive in relation to
> the alternative purpose assigned.

*Id.* at 903-04 (quoting *Turner v. Glickman*, 207 F.3d 419, 429 (7th Cir. 2000)). The court

concluded that "the factors weigh strongly in favor of a civil characterization of vehicle

disposition." *Id.* at 905. In short, the State's (or City's) categorization of a matter as "civil"

controls for federal law purposes, at least so long as the sanction involved is not overly punitive.

Here, Wisconsin law expressly defines the ordinances on which the City is relying as

*civil* proceedings. Wis. Stat. § 800.02(1) ("An action in municipal court for violation of a

municipal ordinance is a ***civil action***.") (Emphasis added). Further, the "Forfeitures" section of

the Public Transportation Ordinances does not provide for a criminal penalty. MGO

§ 11.06(13)(e) ("Any person violating the provisions of this section shall be subject to a

forfeiture of not less than one hundred dollars ($100) nor more than one thousand dollars

($1,000) for each and every offense."). The express definition as a civil proceeding and the fine

structure is a clear indication that both the State and City legislative bodies "indicated either expressly or impliedly a preference" for the Public Transportation Ordinances to be treated as a civil matter. *See Hudson*, 522 U.S. at 99.

Because the State and City legislatures intended the Public Transportation Ordinances to be civil matters, that categorization controls unless the scheme is so overtly punitive that it must be classified as criminal. Here, the factors courts traditionally look to, *see, e.g., Robledo*, 444 F. Supp. 2d at 903-04, support the City's ability to categorize the Public Transportation Ordinances as civil. Violations are not punishable by imprisonment, *see id.*, 444 F. Supp. 2d at 904; there is no suggestion that Public Transportation Ordinances have historically been regarded as criminal; and violations do not turn on a finding of scienter. Perhaps most importantly, the Public Transportation Ordinances themselves state that they serve the non-punitive purposes of ensur[ing] "safe, convenient and efficient public transportation for hire," "[p]rotect[ing] the health and safety of the drivers of public passenger vehicles," "[e]liminat[ing] conflict and confusion among different types of service," and "provid[ing] better public service." MGO §§ 11.06(1)(a)-(d).

To be sure, the ordinances are enforceable through fines, and courts have suggested that a fine "has an inherent retributive and deterrent effect," more akin to criminal punishment. *See Robledo*, 444 F. Supp. 2d at 904. But, that would be true of *any* monetary penalty, and yet the Seventh Circuit has expressly noted that "civil penalty systems" do not make a matter criminal. *See Van Harken*, 103 F.3d at 1349. Thus, without some additional showing, that is not sufficient to render the ordinances here criminal.

Further confirming this result, federal courts applying the principles discussed above have routinely concluded that municipal civil forfeiture cases fall within the diversity

14

jurisdiction.  For example, in *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), the

court considered whether defendant's Internet "erotic services" classified ads facilitated

prostitution and therefore constituted a public nuisance in violation of  city ordinances.  The

court expressly addressed diversity jurisdiction and concluded it existed.  *Id.* at 964-65.  *See also*

*Village of DePue v. Exxon Mobile Corp.*, 537 F.3d 775, 784-85 (7th Cir. 2008) (affirming district

court's conclusion that it had diversity jurisdiction to entertain action premised on village's

nuisance ordinance); *Town of Ogden Dunes*, 2008 WL 1804104 (remanding because defendant

did not timely remove but implicitly finding diversity jurisdiction otherwise existed); *Berkowitz*

*v. Brahma Inv. Grp., Inc.*, No. 1:14-cv-543, 2014 WL 4206946 (S.D. Ohio Aug. 25, 2014)

(denying motion to remand by city seeking to have real property declared a public nuisance,

rejecting city's argument the lawsuit was quasi-criminal and not subject to removal).

 The cases that the City cites in its Motion on this issue are easily distinguished.  For

example, the City cites *Racine County v. Deligiannis*, 380 F. Supp. 1406 (E.D. Wis. 1974)—a

brief court order that pre-dates the cases cited above and, from what Uber can tell, has never

been cited by any other court—for the proposition that "county-based prosecutions of ordinances

are essentially penal in nature."  (Doc. No. 8 at 4 (quoting *Racine County*, 380 F. Supp. at

1407)).  There, the court relied on its assessment that shutting down defendant's business

operation for zoning violations "is consistent with traditional norms of criminal equity

jurisdiction."  *Racine County*, 380 F. Supp. at 1407.  But, here, the Court need not resort to

"traditional norms of criminal equity" for categorizing the Public Transportation Ordinances, as

the State of Wisconsin and the City of Madison have explicitly instructed that they are civil

proceedings.  *See* Wis. Stat. § 800.02(1); MGO § 11.06(13)(e).

Likewise, the City's citation to *State of Ga. ex rel. Slaton v. Fleck & Assocs., Inc.*, 622 F. Supp. 256 (N.D. Ga. 1985), is misplaced.  Again, this case pre-dates cases like *Dart*, *Village of DePue*, *Town of Ogden Dunes*, and *Berkowitz*, and, even more importantly, *Slaton* dealt with a public nuisance ordinance aimed at reining in "incidents of lewdness, oral and anal sodomy, and sexual contact between various male patrons" at defendant's club and assertions by the state that "[t]he activity at Club Atlanta . . . ***violates the criminal laws***." *Id.* at 257 (emphasis added).  The district court concluded (presumably under the second prong discussed above, although the court was not explicit) that the ordinance at issue was truly a criminal penalty because "the prohibitory nature of the action aids in the enforcement of Georgia's ***criminal laws***." *Id.* at 259 (emphasis added).  The facts in *Slaton* are vastly different from those alleged here.  As discussed above, the Public Transportation Ordinances here pass muster under the second prong of the civil-criminal analysis; they are not civil ordinances masquerading as criminal laws.  And, the City has not asserted that its Complaint is related to criminal enforcement efforts.

The State of Wisconsin and the City of Madison have categorized the ordinances here as civil.  That determination controls absent a compelling showing to the contrary.  The City has failed to make that showing here.[3]

---

[3]  The City also devotes a full paragraph of its Motion to assuring the Court that the Madison Municipal Court is not prejudiced against Uber and is sufficiently independent from the City to fairly adjudge Uber's rights in this action.  As the United States Supreme Court has noted, though, diversity jurisdiction "open[s] the federal courts' doors to those who ***might*** otherwise suffer from local prejudice against out-of-state parties." *Hertz Corp. v. Friend*, 559 U.S. 77, 85 (2010) (emphasis added).  *See also Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001) (noting that diversity jurisdiction "seeks to ensure a correct decision, in the sense of being rendered on the merits of the parties' case rather than because of prejudice against a foreigner").  It is the ***possibility*** of such prejudice that underlies diversity jurisdiction.  Uber need not offer any evidence that it will ***actually*** suffer such prejudice here, and the City's assurances in that

## CONCLUSION

For the foregoing reasons, this case falls within the diversity jurisdiction of this Court,

and Uber respectfully urges this Court to deny the City's Motion to Remand.

<div style="margin-left:50%">

Respectfully submitted,
HALLING & CAYO, S.C.

By:/s/Michael Schaalman
Michael H. Schaalman (# 1015424)
(mhs@hallingcayo.com)
Jeremy P. Levinson (# 1026359)
(jpl@hallingcayo.com)
Patrick T. O'Neill (#1079079)
(pto@hallingcayo.com)
HALLING & CAYO, S.C.
320 East Buffalo St., Suite 700
Milwaukee, Wisconsin 53202
(414) 271.3000 (telephone)
(414) 271.3841 (facsimile)

*Of Counsel*:
Douglas R. Cole (Ohio 0070665)
drcole@organcole.com
Carrie M. Lymanstall (Ohio 0084393)
cmlymanstall@organcole.com
ORGAN COLE LLP
1330 Dublin Road
Columbus, OH 43215
614.481.0900
614.481.0904 (f)
*Admitted Pro Hac Vice*

*Attorneys for Defendant*

</div>

---

regard are thus irrelevant.  The only question is whether this case meets the requirements for diversity jurisdiction under 28 U.S.C. § 1332, and for the reasons set forth above, it does.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing was filed electronically with the Clerk of the Court to be served via operation of the Court's electronic filing system this 26th day of March 2015 to all counsel of record.

/s/ Michael Schaalman

*One of the Attorneys for Defendant Uber Technologies, Inc.*