UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CITY OF MADISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:15-CV-101 |
| | ) |
| UBER TECHNOLOGIES, INC. | ) |
| | )   JUDGE CRABB |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANT UBER TECHNOLOGIES, INC.'S
BRIEF IN SUPPORT OF MOTION TO DISMISS**

Through this lawsuit, Plaintiff the City of Madison (the "City") seeks to force a square peg into a round hole. The City tries to stretch Madison's existing municipal public transportation ordinances to cover Uber Technologies, Inc.'s ("Uber") innovative new technology, which creates a new transportation model to which the existing ordinances do not apply. More specifically, the ordinances regulate those who provide *public* transportation—*i.e.*, common carriers. But, as the City's Complaint recognizes, ridesharing services enabled through Uber's software application (the "App") simply do not fall into that category; those ridesharing services are not available to the public at large, but rather only to those who are members of Uber's online community.

Both the state statute that empowered the City to adopt its public transportation ordinances, as well as the language and structure of the ordinances themselves, confirm that the cited ordinances are limited to vehicles that offer transportation to the public generally. First, the state statute authorizes cities to regulate "taxicabs," a term long understood to refer only to

vehicles that act as common carriers—*i.e.*, that are open to the public generally. The cited ordinances thus must be read consistently with this grant of power. Indeed, reading the ordinances more broadly, as the City asks here, would render them invalid. Second, the plain language of the ordinances, read in context, likewise confirms that they are directed to common carriers. The ordinances appear in Chapter 11 of the Madison General Ordinances ("MGO"), labeled "Public Utilities." Chapter 11 regulates railways (a classic common carrier), motor buses (but only when acting as a common carrier, *see* MGO § 11.02), and "public passenger vehicles" (the category on which the City relies here). And the City's stated purpose in regulating "public passenger vehicles" is to provide "safe, convenient and efficient ***public transportation*** for hire." MGO § 11.06(1)(a) (emphasis added). In short, every aspect of this regulatory scheme confirms it is directed only at transportation open to ***the public generally***.

These ordinances do not apply to Uber's ridesharing model. Ridesharing requested through the Uber platform is not available to the public generally, but rather only to those who have joined the Uber online community. Indeed, unlike taxicabs, "the public generally" has no way to identify drivers who provide ridesharing services, nor any way to request services from a driver, both of which are accomplished (as the Complaint alleges, *see* ¶ 3) solely through the Uber App that members receive when they register an account with Uber and join Uber's online community. Because drivers using Uber's platform are not common carriers, they do not fall within the City's public transportation ordinances, and thus the Complaint fails to state a claim.

The Complaint fails for a second reason. The cited ordinances prohibit ***transporting*** persons in Madison. Yet, the Complaint fails to allege ***anywhere*** that even a single rider was actually transported anywhere in the City. Rather, the Complaint only alleges that transportation

2

services were *available* in the City.  That is not enough.  The Complaint fails as a matter of law, and Uber respectfully urges this Court to dismiss it.

## BACKGROUND

### A.     Uber Is A Technology Company, Not A Transportation Provider, And Its Ridesharing Request Services Are Not Open To The Public Generally, But Rather Only To Members Of Uber's Online Community.

Uber is a technology company.  According to the City, Uber has developed "a new model" for providing transportation services.  (Doc. No. 1-1, Compl. ¶ 3).  In particular, Uber "has created an application for smart phones (the Uber App) . . . ." (*Id.*).  The Uber App allows users who have joined Uber's online community to use the Uber App to request ridesharing services from independent third-party drivers who are also members of that community.  While the City first asserts that the Uber App "allows members of the public to search for automobiles to provide transportation for a fee," (*id.*), the City immediately concedes that the Uber App is not really open to "the public."  In particular, the Complaint acknowledges that, in order to become eligible to participate in ridesharing services, users must first join the Uber online community by downloading the mobile application and creating an account.  (*Id.*).  The Complaint likewise concedes that drivers must join the Uber online community before participating in ridesharing: "Persons wishing to drive under the Uber model must sign a contract with Uber."[1]  (*Id*. ¶ 4).  Until a person has joined Uber's online community, he or she cannot use Uber's website or mobile application to request or provide ridesharing services.

---

[1] In fact, the independent third-party ridesharing service providers actually execute a contract with Rasier LLC, an Uber subsidiary, not Uber Technologies, Inc.  For purposes of this Motion to Dismiss though, Uber accepts the factual allegations in the Complaint as accurate, as it must.

### B. The City's Complaint Seeks to Enforce Ordinances That Regulate Public Transportation.

The Complaint alleges violations of Madison General Ordinances § 11.06(2), § 11.06(4)(a), and § 11.06(4)(b) (collectively the "Public Transportation Ordinances"). (*See* Compl. ¶¶ 7-8). The ordinances were adopted pursuant to Wisconsin Statute Section 349.24, which provides that "[t]he council of any city . . . may: (a) [r]egulate and license chauffeurs and operators of taxicabs used for hire; [and] (b) [r]egulate and license the taxicab business by licensing each taxicab used for hire." Wis. Stat. §§ 349.24(1)(a)-(b).

The specific ordinances here appear in Chapter 11 of the Madison General Ordinances, labeled "Public Utilities." The subchapter containing the three ordinances is directed to "public passenger vehicles." The subchapter is entitled: "LICENSING AND REGULATING **PUBLIC** PASSENGER VEHICLES, FOR HIRE." MGO § 11.06 (emphasis added). The first section in the subchapter sets forth the purposes this subchapter is designed to achieve, which are to ensure "safe, convenient and efficient public transportation for hire," to "[p]rotect the health and safety of the drivers of public passenger vehicles," and to "provide better public service." MGO §§ 11.06(1)(a)-(b), (d).

The first of the three ordinances, § 11.06(2), requires public transportation providers who "engage in the business of transporting passengers for hire or drive a vehicle transporting passengers for hire within the City limits of Madison" to obtain a license. *Id.* § 11.06(2)(a). It further provides that "[n]o person shall operate any public passenger vehicle until s/he shall have obtained a public passenger vehicle driver's permit from the Chief of Police." *Id.* § 11.06(2)(e).

The remaining two provisions are both in § 11.06(4), which is entitled "Licensing of Public Passenger Services." Section 11.06(4)(a) sets forth the fees for a license to engage in the

4

business of transporting passengers. The remaining cited provision, § 11.06(4)(b), establishes the application process for such a license.

      **C.    The City's Complaint Does Not Allege That Uber Provides Transportation Services To The Public Generally, Nor Does It Allege That Anyone In Madison Has Actually Been Transported.**

The Complaint appears to assert that Uber violates the Public Transportation Ordinances merely by making the Uber App available within City limits.[2] In particular, the City alleges that the Uber App allows passenger members of the Uber online community to contact those drivers who have also joined that community to request a ride. (*Id.* ¶ 4). According to the City, drivers who are available to accept requests appear as an automobile icon on the Uber App screen. (*Id.* ¶ 5). If a driver chooses to accept a transportation request, the automobile icon (indicating a driver's availability) disappears from the App. (*Id.*).

Against this basic alleged arrangement, the City pleads thirty-nine "counts" based solely on instances in which two individuals accessed the Uber App and observed an automobile icon within the City of Madison. (*Id.* ¶¶ 9-10). Specifically, the City alleges five instances in which its employee, Keith Pollock, observed an automobile icon (with each such observation allegedly giving rise to three separate ordinance violations) and eight instances in which Justin LaPlante, *a local taxicab driver*, observed the icon (again, with each such observation allegedly giving rise to three violations). (*Id.*). The City does *not* allege that either of these two individuals ever actually *received* or even witnessed ridesharing services requested through the Uber App. The City then alleges three instances in which Madison police officers cited individuals for violating City ordinances, allegedly by utilizing the Uber App as drivers (although the City never alleges that any of the drivers actually transported any passengers). (*Id.* ¶¶ 11-13).

---

[2] While Uber does not concede the accuracy of any fact alleged in the Complaint, the facts as pled, of course, must be accepted as true for the purposes of this Motion.

Based on these allegations, the City alleges that Uber is "engaged in the business of transporting passengers for hire" without obtaining a license, paying licensing fees, and filing an application. (*Id.* ¶ 2). In particular, the City asserts that Uber engages in that business "through its agreements with its Uber Drivers":

> Based on the Uber transportation model, the appearances of automobile icon [sic] and an address requesting services on the Uber App demonstrates that Uber, through its agreements with its Uber Drivers is "engage[d] in the business of transporting passengers for hire."

(*Id.* ¶ 6). As noted above, the City alleges that each observation of an automobile icon, and each driver citation, violates three separate but related provisions of the MGO: Sections 11.06(2), 11.06(4)(a), and 11.06(4)(b). (Compl. ¶¶ 9-13). The City further alleges that each violation is subject to a "forfeiture" of "$100 to $1,000 per count, per day; plus applicable costs . . . and any such further relief as the plaintiff may request." (*Id.*, page 3).

## LAW AND ARGUMENT

### I. The City's Complaint Fails To State A Claim.

To satisfy Federal Civil Rule 12(b)(6), a complaint must do more than "offer[] labels and conclusions," rather, it must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Thus, the "essence of a Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts; rather it is that even assuming all of the facts presented are accurate, [plaintiff] has no legal claim." *BDI Liquidating Co., Inc. v. Quest Graphic, LLC*, No. 06-C-0620, 2007 WL 2492740, at *1 (E.D. Wis. Aug. 29, 2007).

Applying those standards here, the City's Complaint fails to set forth a viable claim for two reasons. First, the ordinances on which the City relies apply only to "common carriers," or those whose transportation services are held open to the public generally. Ridesharing services requested through Uber's platform do not fall into that category. Second, even if the ordinances did apply, the City has failed to allege that anyone was actually transported, a necessary element for any violation of these ordinances. For both of these reasons, the Complaint fails as a matter of law.

**A.      The Ordinances That The City Cites Apply Only To Those Whose Services Are Open To The Public Generally, But Ridesharing Services Requested Through Uber's Platform Are Available Only To Members Of Uber's Online Community.**

This action fails out of the starting blocks because the ordinances do not apply to the ridesharing activities alleged in the Complaint. Correctly understood, the ordinances apply only to common carriers. This is true for two reasons. First, the enabling act pursuant to which the City adopted its ordinances is limited to "taxicabs," a word that has long been understood as limited to common carriers. Second, the ordinances themselves, when read in context, confirm that they are limited to common carriers—those who provide transportation to the public generally. But, the ridesharing activities alleged here do not qualify.

**1.      The State Enabling Act For The Ordinances Here Is Limited To Vehicles That Act As Common Carriers.**

The City's power to require licenses for those who use motor vehicles to provide transportation services arises from the state legislature's grant of authority under Wis. Stat. § 349.24. *See Courtesy Cab Co. v. Johnson*, 10 Wis. 2d 426, 435, 103 N.W.2d 17 (1960) (noting that "[t]he power of the city of Milwaukee to enact [a taxicab ordinance] emanates from the authority granted in and by sec. 349.24, Stats., 1957"); *see also County of Milwaukee v. Williams*, 2007 WI 69, ¶ 56, 301 Wis. 2d 134, 732 N.W.2d 770 ("Under [Wis. Stat. § 349.24],

7

city councils and village and town boards may regulate and license taxis and drivers."). This enabling statute is entitled "Authority to license taxicab operators and taxicabs," and it provides that:

> (1) The council of any city and every village or town board may:
>
> (a) Regulate and license chauffeurs and operators *of taxicabs* used for hire;
>
> (b) Regulate and license *the taxicab business* by licensing *each taxicab* used for hire;
>
> (c) Prohibit any person from operating any motor vehicle for *taxicab purposes* upon the highways of the city, village or town unless the person is licensed as a chauffeur and operator and unless the taxicab business is licensed by the licensing of each taxicab;
>
> (d) Revoke any license mentioned in this section when in its judgment the public safety so requires.

Wis. Stat. § 349.24(1) (emphases added). Thus, the Wisconsin legislature specifically limited the City's regulatory authority over transportation providers to "chauffeurs and operators *of taxicabs*," and "the *taxicab* business." *Id.*

The City's attempts to apply its Public Transportation Ordinances to Uber conflicts with the plain and unambiguous language in § 349.24(1), as those who provide ridesharing services requested through the Uber software platform are not "taxicabs" or engaged in "the taxicab business." The term "taxicab" in § 349.24 is not defined by statute. Under well-settled law, then, "[n]on-technical words and phrases not defined within the statutory scheme are usually given their common, ordinary, and accepted meaning." *State v. Dinkins*, 2010 WI App 163, ¶ 11, 330 Wis. 2d 591, 794 N.W.2d 236. The "common, ordinary and accepted meaning" of "taxicab" includes only those vehicles that are "common carriers," or in other words, open to the public generally.

Indeed, well over 100 years' worth of common law (dating back to the mass introduction of automobiles and the development of the taxicab industry shortly thereafter) acknowledges that the term "taxicab" is ordinarily understood to refer to vehicles that are acting as "common carriers." *See* Edwin R. Keedy, *Is a Taxicab Company a Common Carrier?*, 66 U. Penn. L. Rev. 71, 71 (1917) ("taxicab companies are common carriers"); *see also, e.g.*, *Connell v. Call-A-Cab*, 937 So. 2d 71, 73 (Ala. 2006) ("[T]axicabs are common carriers."). Consistent with that, Wisconsin case law likewise places "taxicabs" into the category of common carriers for liability purposes[3]: "A taxicab company is a common carrier and owes to its passengers the highest degree of care consistent with the transaction of the business." *Scales v. Boynton Cab Co.*, 198 Wis. 293, 294, 223 N.W. 836 (1929); *see also Fleischman v. Holz*, 23 Wis. 2d 415, 422-23, 127 N.W.2d 9 (1964). Cases from other jurisdictions hold the same. *See, e.g.*, *Finlayson v. Yellow Cab Co.*, 217 N.W. 662, 663 (N.D. 1928) ("Whatever controversy may have existed among the earlier decisions of the courts relative to the duty and liability of . . . taxicabs . . . holding themselves out to the public as ready to receive and transport passengers for hire, it is now well established that the rule applicable to common carriers of passengers for hire generally prevails and applies."); *Korner v. Cosgrove*, 141 N.E. 267, 268 (Ohio 1923) ("[A]ll authorities without exception have declared that public taxicabs, operated for hire, and which are offered

---

[3] To be sure, taxicabs are excluded from statutorily-created category of "common motor carrier" found in Wis. Stat. § 194.01(1). But, the statutory scheme in that Chapter is directed only to identifying those vehicles that are subject to a separate **state-level** set of regulations, rather than local ordinances, when they are operating outside of municipal boundaries. Case law confirms that this statutory designation does not change the fact that the term "taxicab" is understood to refer to those vehicles that meet the common law test for common carriers. *See Hunt ex rel. Gende v. Clarendon Nat'l Ins. Serv., Inc.*, 2005 WI App 11, ¶ 13, 278 Wis. 2d 439, 691 N.W.2d 904 ("[A]lthough taxicabs are specifically excluded from the definition of 'common motor carrier' found in Wis. Stat. § 194.01(1), in a negligence context, the common-law duty as to common carriers applies equally to taxicabs.") (internal citation, alteration, and quotation marks omitted).

promiscuously to the public for service of transportation of passengers, are common carriers."). Accordingly, the common, ordinary understanding of the word "taxicab," and thus the meaning ascribed to it in § 349.24, captures only those vehicles that are common carriers.

A "common carrier," in turn, "is one who engages in the transportation of persons or things from place to place for hire, and who *holds himself out to the public as ready and willing to serve the public indifferently*." *Harper v. Agency Rent-A-Car, Inc.*, 905 F.2d 71, 73 (5th Cir. 1990) (internal quotation marks and citation omitted) (emphasis added). Or, as another court put it, "[a] 'common carrier' has been defined as: one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, *offering his services to the public generally*." *Luman v. ITS Techs. & Logistics, LLC*, 323 S.W.3d 821, 825 (Mo. Ct. App. 2010) (citing *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 645 (5th Cir. 1967)) (emphasis added). *See also, e.g.*, *Brown v. Allright Auto Parks*, *Inc.*, 456 S.W.2d 660, 665 (Tenn. Ct. App. 1970) ("A common carrier may be defined, very generally, as one who holds himself out to the public as engaged in the business of transporting . . . offering his services to the *public generally*. The dominant and controlling factor in determining the status of one as a common carrier is his public profession or holding out . . . .") (emphasis added). Indeed, courts have relied on this notion of "serving the public generally" to distinguish between common carriers and private carriers: "a common carrier is impliedly one who is engaged in the business of transportation *for anyone who wishes to use the service*, while a private carrier renders . . . service only for certain people or certain businesses." *Luman*, 323 S.W.3d at 825 (emphasis added). To qualify as a common carrier, then, an entity "*must* hold itself ready to serve the public impartially to the limit of its capacity." *Petrasek v. TC3*

10

*Operations, Inc.*, 2011-Ohio-1962, ¶ 23 (Ohio Ct. App. 2011) (emphasis added).  Or, as one court observed, citing case law that goes back as far as 1847:

> From the earliest days of the Republic a finding of certain qualities has been ***required*** to impose upon a party the duties of a common carrier.  ***That the transportation is available to the public generally is the distinctive characteristic.***

*Durham Transp., Inc. v. Valero*, 897 S.W.2d 404, 408 (Tex. Ct. App. 1995) (citing *Chevallier v. Straham*, 2 Tex. 115, 119 (Tex. 1847)) (emphasis added).

   As an interpretive matter, then, because the City ordinances at issue here reflect the regulatory power granted under § 349.24, they are necessarily limited to the commonly understood meaning of "taxicabs," *i.e.*, common carriers, or vehicles that provide transportation services to the public generally.  But ridesharing services requested through the Uber platform do not meet the "distinctive characteristic" of a common carrier.  That is, Uber ridesharing services are not "available to the public generally."  In fact, the City has not alleged that Uber is a common carrier, nor could it.  Uber does not and never has held itself out "as ready and willing to serve the public indifferently."  *See Harper*, 905 F.2d at 73.  Rather, as the Complaint recognizes, the ridesharing services enabled via the Uber App are available only to those who join Uber's online community.  Accordingly, the State's delegation of authority to the City to regulate and license "taxicabs" does not carry with it the authority to regulate Uber ridesharing request services.

   If the City is now seeking to apply its ordinances more broadly, the City runs headlong into the principle that a rule "exceeds an agency's statutory authority if it conflicts with an unambiguous statute."  *State ex rel. Castaneda v. Welch*, 2007 WI 103, ¶ 43, 303 Wis. 2d 570, 735 N.W.2d 131 (quoting *Seider v. O'Connell*, 2000 WI 76, ¶ 72, 236 Wis. 2d 211, 612 N.W.2d 659) (finding rule adopted by city's fire and police commission invalid because it exceeded

scope of authority delegated by Wisconsin legislature). Because Uber ridesharing request services do not qualify as a "taxicab business," any attempt to interpret the Public Transportation Ordinances to apply to Uber's ridesharing model squarely conflict with the unambiguous language of § 349.24, rendering the ordinances invalid.

In short, properly interpreted, the ordinances do not cover the ridesharing request services alleged here. And to the extent that the ordinances are read to apply to such activities, they are invalid. For either or both of these reasons, the Complaint fails as a matter of law.

### 2. The Plain Language Of The Cited Ordinances Confirms That The Ordinances Apply *Only* To Common Carriers.

Even apart from the limitation that Wisconsin Statute Section 349.24 imposes, the plain language of the ordinances themselves, read in context, further confirms that the ordinances are directed to common carriers, or those that carry the public generally. As noted above, the ridesharing activities alleged here do not fall into this category.

The cited ordinances appear as part of Chapter 11 of the Madison General Ordinances, which is titled "Public Utilities." Consistent with that title, the ordinances in the Chapter are directed at three modes of transportation available to the public generally. First, the ordinances address railways, *see* MGO § 11.02, perhaps the classic example of a "common carrier." Second, the ordinances address "motor buses," *see* MGO §§ 11.02-05, but only to the extent that the motor buses are acting as "common carriers." *See id*. at § 11.02(a) ("It shall be unlawful for any ***common motor carrier*** of passengers, that is, any person, firm or corporation holding himself or itself out to the public, as willing to undertake for hire to transport persons . . . .") (emphasis added).

Finally, the specific ordinances here address "***public*** passenger vehicles." The subchapter in which they appear is entitled "Licensing and Regulating ***Public*** Passenger

Vehicles, for Hire." MGO § 11.06 (emphasis added). Similarly, the "purpose" section of subchapter 11.06 expressly acknowledges that the ordinances were adopted for the purpose of regulating *publicly available* transportation. *See* MGO §§ 11.06(1)(a)-(b), (d); *see also Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (noting that statutory interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute"); *Schill v. Wis. Rapids Sch. Dist.*, 2010 WI 86, ¶¶ 103-04, 327 Wis. 2d 572, 786 N.W.2d 177 (relying on the "explicit legislative purposes" identified in state public records law to determine that teachers' personal e-mails are not public records). The purpose provisions note, for example, that the ordinances are designed to "provid[e] for safe, convenient and efficient *public* transportation" and "provide better *public* service." MGO §§ 11.06(1)(a), (d) (emphases added). Not captured anywhere within the "purpose" section of subchapter 11.06 is an intent to regulate services available through subscriber-only applications.

Of course, that only makes sense. As discussed above, historically, common carriers are subject to heightened regulatory scrutiny. Consistent with that, the ordinances here are designed to address taxicab (or perhaps livery) rides—which are open and held out to the public generally, and which thus require licensing and permitting, which the City is allowed to require under Wis. Stat. § 349.24. For example, while MGO § 11.06(2)(a) prohibits "engag[ing] in the business of transporting passengers for hire or driv[ing] a vehicle transporting passengers for hire within the City limits of Madison unless duly licensed to so," the "business" to which that ordinance applies must be understood within the broader context of the regulatory scheme, which is directed at public transportation. Or as another of the cited ordinances explains, "[n]o *public* passenger vehicle shall be used to transport passengers for hire" unless a permit has been issued. *Id.* § 11.06(2)(b) (emphasis added). And while the definition of "public passenger vehicle" under

the ordinance may be ambiguous on this point, *see* MGO § 11.06(3)(s), the repeated reference to "public" throughout the ordinance makes clear that the ordinance's area of application is limited to those modes of transportation held out to the public generally, *i.e.*, common carriers. Indeed, confirming the public nature of the transportation to which the ordinances are directed, MGO § 11.06(7)(c) expressly prohibits drivers of these "public vehicles" from refusing to transport any passenger in the City (unless the passenger is "violent, abusive or indecent"), just as one would expect for common carriers. And from a more practical standpoint, failing to recognize this limitation on the scope of the ordinances here would make every college student who offers a ride to a fellow student in exchange for gas money subject to claims by the City and civil forfeiture. That would be absurd, and the absurdity of that result further supports the conclusion that the City is acting beyond the scope of the authority granted by the legislature when it attempts to subject ridesharing services to common carrier regulations.

Further underscoring the fundamental misfit between Madison's current ordinances and the services that ridesharing platforms offer, even now new legislation is in the works that would expressly address ridesharing services. *See* Madison Common Council, Proposal #34016 (introduced May 6, 2014). Of course, if the regulations as currently drafted ***already*** applied to Uber or independent, third-party transportation providers who use the Uber App, there would hardly be a reason to draft new legislation for the same purpose. In short, the regulations as written do not apply to Uber's peer-to-peer ridesharing request model, and thus the City's claims should be dismissed as a matter of law.

To be clear, Uber is not arguing in this Motion that the City's claims should be dismissed because, as a factual matter, the ridesharing services at issue here are not available to the public generally (although that is factually true). Rather, the point is that the City has failed to ***allege***

(probably because it cannot do so) that these ridesharing services are available to the public generally.  To the contrary, the Complaint expressly acknowledges that only those who have signed up with Uber—*i.e.*, joined the Uber online community—can access ridesharing services.  In conceding that point, the City has made an all-in gamble—that it is correct in its hopelessly flawed reading of the ordinances, under which the City need not allege or prove that the transportation services are "public."  The City's improper reading of these ordinances is wrong as a matter of law, and thus its Complaint fails to state a claim.

> **B.     The City's Complaint Must Be Dismissed Because It Fails To Allege The Essential Element That Uber Actually "Transported" A Member Of The Public.**

Even if the City were correct that Uber's business model is subject to regulation by the City under Wisconsin Statute Section 349.24 *and* falls within the ambit of Madison's Public Transportation Ordinances, the City's Complaint fails as a matter of law for yet another reason.  In particular, the so-called "counts" in the Complaint fail to allege that Uber (or even any third-party transportation provider using the Uber platform) actually *transported* any member of the public.  As transporting passengers is a necessary aspect of any violation, that failure dooms the Complaint.

The basic prohibition at issue here prevents parties from "engag[ing] in the business of transporting passengers for hire" without first obtaining a license.  Nowhere among the forty-two "counts," however, is there any allegation that Uber, or any driver using Uber's mobile application, actually "transport[ed] passengers for hire."  Instead, for thirty-nine of the forty-two claims, the City hangs its hat on allegations that two individual members of the Uber online community (including a taxicab driver) picked up their smartphones on various days, opened the Uber App, and saw an automobile icon. (Compl. ¶¶ 9-10).  What the City does not allege, however, because it has no factual basis to do so, is that the driver ostensibly represented by the

15

automobile icon actually picked up a passenger and drove him or her somewhere within the City of Madison for a fee.

Certainly, it cannot be enough to claim that Uber "engage[d] in the business of transporting passengers for hire" simply by alleging that two people saw an automobile icon. (*See* Compl. ¶ 2). To be "engaged in a business of transporting" must require more than transmitting an automobile icon via a mobile application—at the very least, it requires actual transportation. Indeed, interpreting the "business of transporting" so broadly as to capture the mere act of displaying information about cars on a screen would raise substantial constitutional "void for vagueness" concerns. *See Waldron v. McAtee*, 723 F.2d 1348, 1358 (7th Cir. 1983) (explaining that ordinances must define what is prohibited "with sufficient definiteness that ordinary people can understand what conduct is prohibited" because "[o]therwise a citizen would not have fair notice of what he must do to conform his behavior to the law").

The three remaining claims ("counts" 40-42) likewise fail to allege a member of the public was actually transported. Instead, each of the three claims simply allege that a particular driver "was working as an Uber driver and using the Uber App" at the time he or she was cited by a Madison police officer. (Compl. ¶¶ 11-13). Based on these insufficient allegations, the City pleads the legal conclusion that the citations constitute "a violation of sec. 11.06(2), 11.06(4)(a) and 11.06(4)(b), MGO." (*Id.*). Again, the City makes no allegation that the cited drivers transported anyone. Further, the City does not plead facts underlying the citations issued to the drivers or explain what each driver did to violate the Madison General Ordinances. As this Court is well aware, a complaint must do more than "offer[] labels and conclusions," rather, it must allege "sufficient factual matter" to state a facially plausible claim for relief. *See Iqbal*,

556 U.S. at 678. Because the City fails to allege sufficient facts underlying its claims, this Court should dismiss the City's claims for this reason as well.

## CONCLUSION

For the above reasons, this Court should grant Uber's Motion and dismiss the City's Complaint with prejudice.

    Respectfully submitted,
    HALLING & CAYO, S.C.

    By: /s/Michael Schaalman
    Michael H. Schaalman (# 1015424)
    mhs@hallingcayo.com
    Jeremy P. Levinson (# 1026359)
    jpl@hallingcayo.com
    Patrick T. O'Neill (# 1079079)
    pto@hallingcayo.com
    HALLING & CAYO, S.C.
    320 East Buffalo St., Suite 700
    Milwaukee, Wisconsin 53202
    (414) 271.3000 (telephone)
    (414) 271.3841 (facsimile)

    *Of Counsel*:
    Douglas R. Cole (Ohio 0070665)
    drcole@organcole.com
    Carrie M. Lymanstall (Ohio 0084393)
    cmlymanstall@organcole.com
    ORGAN COLE LLP
    1330 Dublin Road
    Columbus, OH 43215
    614.481.0900 (telephone)
    614.481.0904 (facsimile)
    *Admitted Pro Hac Vice*

    *Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing was filed electronically with the Clerk of the Court to be served to all counsel of record via operation of the Court's electronic filing system this 30th day of March 2015.

/s/ Michael Schaalman
*One of the Attorneys for Defendant Uber Technologies, Inc.*